Decided 23 July, 1900.

## MCMANUS *v.* SMITH.

[ 61 Pac. 844.]

NONTRADING PARTNERSHIP—IMPLIED AUTHORITY OF PARTNER.

1.  A member of a nontrading partnership has no implied authority to give a note in the firm name in a transaction outside of the apparent and actual scope of the partnership business, and persons dealing with such a firm in such matters must affirmatively show the authority of the partner with whom they dealt.

DISSOLUTION OF PARTNERSHIP—PAYMENT OF DEBTS.

2.  In closing up a partnership the court should not direct the payment of a personal debt of one of the partners out of the fund arising from the sale of the partnership property.

PAYMENT OF DEBT OF PARTNERSHIP.

3.  Where it was mutually agreed between partners that the net profits of their business should be forthwith applied to the payment of a firm debt not yet due, the receiver should be directed to pay it out of the funds arising from the sale of the partnership property.

From Umatilla :  STEPHEN A. LOWELL, Judge.

This is a suit by J. P. McManus against D. G. Smith and others to dissolve a partnership, to set aside a chattel mortgage of the partnership property, and for an account-

ing. The transcript shows that on January 9, 1899, the plaintiff, J. P. McManus, in consideration of $400 in money and a promissory note for $500 executed by the defendant D. G. Smith, sold and delivered to the latter an undivided one-half interest in a newspaper published in Pendleton, Oregon, known as the Pendleton Republican, including the machinery, presses, type, and material belonging thereto, whereupon a partnership was entered into between the parties, under the name of the Republican Co., for the publication of said newspaper, and it was stipulated that neither party should mortgage his interest in said property without the consent of the other; that McManus would pay the outstanding debts, and on the first of each month the net profits accruing from the business should be divided equally, and if McManus should, during any month, draw out more than his share of such profits, the excess should be credited upon Smith's note. McManus, at the time the partnership was formed, was indebted to several persons, and, to obtain the money with which to pay them, he and Smith borrowed from Mary A. Murphy $600, giving a note therefor, payable in two years, with interest at five per cent. per annum, and assigned to her, as collateral security, Smith's $500 note. On February 21, 1899, Smith gave the defendant Clarence Miller his promissory note for $1,700, payable one day thereafter, and gave him a chattel mortgage on all said partnership property as security therefor, which mortgage was filed in the office of the County Clerk of Umatilla County on the day it was executed. Three days thereafter McManus, having discovered that said mortgage had been given and filed, instituted this suit, alleging that Smith conspired with Miller, to whom he is related, to so manage the partnership business as to depreciate the value of the property thereof and to defraud plaintiff and the partnership creditors, and that said note and

mortgage were without consideration, and accepted with knowledge of said partnership agreement, by Miller, who threatens to foreclose his pretended security.

McManus having been the editor of the Pendleton Republican, the court appointed him, upon the filing of the complaint, receiver of the partnership property, which enabled him to continue the publication of said newspaper. The defendants Smith and Miller filed separate answers, denying the material allegations of the complaint, and averring that said note and mortgage were executed as evidences of indebtedness upon which Miller paid the Republican Co. the sum of $1,700; and, the promissory note being due, and no payment having been made on account thereof, Miller prayed that said mortgage be foreclosed. Mary A. Murphy, having been permitted to become a party defendant, filed an answer denying the material allegations of the complaint, and averring that on January 9, 1899, McManus and Smith were partners and insolvent, and on that day, a suit having been brought against them, a receiver was appointed, who took possession of all their property; that, to secure the discharge of such receiver and to pay their debts, she loaned them the sum of $600, under an agreement that they would not mortgage said property, and that the net proceeds arising from publishing said paper should be paid to her monthly, in pursuance of which agreement other and further articles of partnership were subscribed by McManus and Smith; and that the mortgage executed by the latter was without consideration, and executed for the purpose of defrauding the creditors of the Republican Co. Replies having put in issue the allegations of new matter in the answers, a trial was had, resulting in a decree as prayed for, and Smith and Miller appeal.

Modified.

For appellants there was a brief over the names of *Thos. G. Hailey* and *Stillman & Pierce*, with an oral argument by *Mr. A. D. Stillman*.

For respondent there was a brief over the names of *James A. Fee* and *Carter & Raley*, with an oral argument by *Mr. Chas. H. Carter*.

Mr. Justice Moore, after making the foregoing statement, delivered the opinion of the court.

It is alleged in the complaint that Smith and Miller are related, but that the degree of consanguinity was unknown to the plaintiff; and this averment is not denied in their answers, it being generally understood that they are half-brothers. Testimony was introduced at the trial tending to show that on January 9, 1899, McManus and Smith owed Miller $50, which they paid him that day from the loan secured from Mary A. Murphy, and, having received that sum, it was all the money that he then possessed. If Miller loaned Smith any money, no part of it was used to pay the firm debts; for, after executing the chattel mortgage, Smith immediately left Pendleton, and two days thereafter wrote Miller the following letter:

"Spokane, Wash., Feby. 23, '99.

*Dear Clarence:*

I got here at five minutes past twelve Thursday night. I met with quite a loss with that money we got from you. I think I will come home Sunday or Monday. How is everything at Pendleton? There were snow and ice on the ground when I got here, and it began to snow yesterday about 5 P. M., and is still snowing hard at 11 o'clock to-day. I like Spokane very well, but I have little faith now in mining, although there is no doubt some are making good money of it.

Yours, truly,    D. G. Smith.

Write me, gen. delivery, Spokane, Wash."

37 Or.—15.

Charles A. Maskrey, plaintiff's witness, testified, in substance, that about two weeks prior to the trial, in the absence of Miller, he had a conversation with Smith, who said that the proceedings adopted were not the result of his judgment, but they had been pursued on the advice of his attorneys to secure the money which he had paid.

The plaintiff and Mary A. Murphy having introduced their testimony and rested, Miller's counsel moved the court for a decree of nonsuit, so far as his answer sought a foreclosure of the chattel mortgage ; neither Smith nor Miller having been called as witnesses, though present at the trial. It is contended by appellants' counsel that, the complaint having been predicated upon the ground of fraud, the burden was upon the plaintiff to prove such averments ; but not having offered any testimony tending to show that the note and mortgage, copies of which were introduced in evidence, were executed without consideration, the defendants Smith and Miller were not required to introduce any testimony, the presumption that a promissory note was given for a sufficient consideration (Hill's Ann. Laws, § 776, subd. 21) supplying the necessary proof. Plaintiff's counsel insist, however, that the publication of a newspaper, the business in which the firm was engaged, being a nontrading partnership, neither partner had implied authority to execute in the name of the firm a promissory note or mortgage, and that, the defendant Miller having dealt with Smith in matters outside the scope of the usual partnership business, the burden was upon them, in order to render the firm liable, to show that Smith possessed special authority to execute in the name of the firm the note and mortgage in question, but not having done so, and a copy of the partnership agreement having been introduced in evidence, showing that neither partner, without

the other's consent, could mortgage his interest in the firm property, the said note and 'mortgage should be canceled.

1.    The general rule is that each partner has implied authority to bind all the partners by his contracts entered into in the firm name with third persons who have no knowledge of any limitation of his apparent power, when such agreements relate to the performance of the business in which the firm is engaged :   17 Am. & Eng. Enc. Law (1 ed.), 987.   When, however, a third person enters into a contract with a partner in the firm name, relating to a subject-matter outside of and beyond the scope of the firm's usual business, before such party can charge the firm he must show that the partner who assumed to act for all the partners possessed special authority so to consummate the agreement relied upon :   Parsons, Partn. (4 ed.) § 85.   A partner in a firm conducting a general commercial business has implied authority to enter into any contract in the name of the firm that usually pertains to the transactions in which such firm is engaged, and as a result of this principle he may sell the partnership property, incur debts, borrow money and execute promissory notes on account of the partnership.   But a partner in a nontrading firm does not possess such general power, and has no authority, as a general rule, to contract debts or issue commercial paper ;   and a third party who has entered into such a contract, in order to hold the firm liable therefor, must affirmatively show that the partner who acts for the firm possessed the power which he assumed :   17 Am. & Eng. Enc. Law (1 ed.), 993.   In *Pooley* v. *Whitmore*, 10 Heisk. 629 (27 Am. Rep. 733), it was held that a firm engaged in the publication of a newspaper at Memphis, Tennessee, was a nontrading partnership, and not liable to a *bona fide* holder, for value, and before maturity, of a promissory note made by one of the parties

for his own benefit, who indorsed the firm name thereon for his accommodation. In *Bays* v. *Conner*, 105 Ind. 415 (5 N. E. 18), a promissory note having been given by a partner in the name of the Central Printing Company, a firm of which he was a member, and it having appeared that said company was in no sense a trading or commercial partnership, it was held that one partner cannot, in the absence of express authority, bind the firm or his copartner by a note executed by him in the firm name, in a transaction wholly outside the apparent and actual scope of the partnership business, although it may appear that the consideration for the note was applied to the payment of a firm debt. The publication of the Pendleton Republican did not make the firm engaged therein a trading or commercial partnership, and, this being so, before Miller could establish the liability of the Republican Company the burden was upon him to show that Smith possessed authority to execute the note given to him. He was present at the trial, and might have made this proof if in his power, but he neglected the opportunity; and, having done so, no error was committed in decreeing a cancellation of the note and mortgage, for if the note was executed without authority, and fails on that account, the mortgage, which is but an incident of the note, must fail also.

2. The court, on March 13, 1899, appointed Lot Livermore joint receiver, who took possession of the partnership property, collected from various sources the sum of $824.77, and paid out on account of expenses $821.52; and having sold the newspaper, machinery, presses, type, etc., realizing therefrom the sum of $950, he reported that he had on hand for distribution the sum of $953.25, against which the following claims had been presented, to wit: Pendleton Republican, printing notice to creditors, $5.00; Ed. Switzler, rent, $100; H. N. Richmond Paper

Co., $42.70 ;  J. P. McManus, services as editor, $200 ;
First National Bank, note and interest, $159.18 ;  Charles
A. Maskery, services, $38 ;  California Ink Co., $17.15 ;
Herald Engraving Co., $6.90,—and that he was entitled
to the sum of $134, compensation as receiver.  Objections
having been made to various items in said report, the
court disallowed the sum of $124.40 paid to McManus,
included in the account of expenses, refused to allow
any sum for publishing the notice to creditors, cut down
Switzler's bill for rent to $45, and McManus' bill as edi-
tor to $152, and approved the report in all other respects,
directing Livermore to pay the respective claimants the
several sums so found to be due them.  The court also
having found that McManus on January 10, 1899, paid
Mary A. Murphy the sum of $325, and that there was
due on her note for $600 the sum of $280.80, directed the
receiver to pay the same to her ;  thus leaving $201.92 in
the hands of the receiver, who was ordered to pay the
costs of the suit, exclusive of the compensation of the
receivers, paying the remainder equally to the plaintiff,
J. P. McManus, and to the defendant, D. G. Smith.  It is
contended that the court erred in the allowance of many
of these claims.  The California Ink Co. on December 2,
1898, wrote the following letter to the Republican Com-
pany :

"We inclose herewith statement of your account.  As
this account is some five months past due, we have to-day
drawn on you at three days for the amount of the account,
$17.15, and must ask you to honor the draft."

This letter has indorsed thereon a statement that "the
above claim is correct, and remains unpaid.

"California Ink Co.,
"Per H. C. Angell.
"June 10, 1899.

"Subscribed and sworn to before me this 10th day of
June, 1899.                         Lot Livermore,
"Notary Public for Oregon."

The partnership dissolved by the decree herein was not formed until January 9, 1899, and, McManus having agreed to pay all outstanding debts, it is evident that he, and not the firm, is chargeable with this item.

3.   We have carefully examined all the other items to which objection was made, and find them correct, but the claim of Mary A. Murphy requires consideration.   It will be remembered that she held McManus' note for $600, payable in two years from January 9, 1899, upon which he paid the sum of $325, and that she also held, as collateral security therefor, Smith's note given to McManus for $500, evidencing a part of the consideration of his purchase, which was payable on or before two years from that date.   The testimony shows that, notwithstanding these notes were not due, it was mutually agreed by all the parties that Mary A. Murphy should be paid monthly the net proceeds derived from the publication of the Pendleton Republican.   The sale of the newspaper defeats the performance of this agreement, and, as the money on hand is sufficient to meet the payment of all claims against the firm and the partners thereof, no error was committed in directing the receiver to carry out the agreement of the parties.   The amount so reported on hand will be increased by the sum allowed the California Ink Co., making the sum of $219.07 to be distributed in the manner specified in the decree ; but, before paying McManus the sum so due him, the receiver is directed to pay therefrom the sum of $17.15 to the California Ink Co.   The decree will therefore be modified as herein indicated.

MODIFIED.